**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:	Brett A. Berman, Esq.
	Steven J. Link, Esq.
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
(609) 896-3600
Attorneys for Plaintiff,
**BH 329 NB LLC**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BH 329 NB LLC**,<br><br>                    Plaintiff,<br><br>         v.<br><br>**CBRE, INC.**,<br><br>                    Defendant. | Civil Action No. 2:16-CV-08141-CCC-MF<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff, BH 329 NB, LLC ("BH 329" or "Plaintiff"), through its attorneys, Fox Rothschild LLP, by way of First Amended Complaint against Defendant, CBRE, Inc. ("CBRE" or "Defendant"), states:

**PARTIES AND BACKGROUND FACTS**

1.	BH 329 is a New Jersey limited liability company located at One West 34th Street, 11th Floor, New York, New York 10001.

2.	CBRE is a Delaware corporation authorized to do business in New Jersey, maintaining a business address at Park 80 West, Plaza Two, 250 Pehle Avenue, Suite 600, Saddle Brook, New Jersey 07663. CBRE provides commercial real estate services, including, but not limited to, leasing and selling commercial properties in the United States.

1

3. Although not a party to this action, API Foils, Inc. ("API") was the owner of certain real property commonly known as 329 New Brunswick Avenue, Rahway, New Jersey, and referenced as Block 276, Lot 10 on the Tax Map of the City of Rahway, County of Union, State of New Jersey, and all improvements thereon (the "Property").

4. API used the Property for industrial purposes to manufacture, among other things, foils, laminates, and holographic materials.

## FACTS COMMON TO ALL COUNTS

**A.  CBRE Promises to BH 329 Not to Market or Entertain Other Offers to Purchase the Property.**

5. API hired CBRE as its real estate broker to oversee and manage the sale of the Property in 2015.

6. CBRE marketed the Property extensively, and after a highly competitive process resulting in multiple offers from multiple parties, API indicated its intention to sell the Property to BH 329 in January 2016.

7. The agreement in principle between API and BH 329 contemplated the Property's sale to BH 329 for $7,500,000 ("Purchase Price"), and API would leaseback the Property from BH 329 for at least one year.

8. On February 10 & 18, 2016, BH 329 and API, respectively, signed a letter of intent ("LOI") outlining their agreement in principle and the terms of sale for the Property.

9. In addition to the Purchase Price, the LOI contemplated that a contract of sale would be executed containing terms and conditions "customarily included in contracts for the sale of similar property."

10. The LOI did not contain an integration clause.

11. After BH 329 and API formed their agreement in principle, CBRE repeatedly assured BH 329 that CBRE would not market or otherwise entertain any other offers to purchase the Property, so long as BH 329 continued to agree on the Purchase Price.

12. As a result of CBRE's direct and repeated representations, BH 329 was led to believe that if BH 329 agreed to the pay the Purchase Price, then CBRE would stop marketing the Property and would not entertain other offers to purchase the Property.

13. BH 329 reasonably believed that API wanted to sell it the Property for several reasons, among them that BH 329 was an ideal buyer and the leaseback terms offered to API were favorable.

14. Unbeknownst to BH 329, API did not authorize CBRE to stop marketing the Property or otherwise stop entertaining other offers to purchase the Property.

15. Unbeknownst to BH 329, and despite its repeated promises to the contrary, CBRE had no authority from API to stop marketing the Property or entertaining other offers to purchase the Property.

16. CBRE has admitted in this action that it had no authority from API to stop marketing, or entertaining other offers to purchase, the Property.

17. CBRE's repeated promises to BH 329 were therefore made without API's authorization and were made outside the scope of CBRE's agency relationship with API.

18. In reliance on CBRE's repeated representations, BH 329 proceeded to satisfy its obligations necessary to finalize and effectuate the sale of the Property.

19. At the behest of CBRE, and in reliance on its assurances that API was committed to selling the Property to BH 329, BH 329 hired an engineer and architect to begin its feasibility analysis of the Property even though the Feasibility Period had not yet been triggered.

20. On March 8 & 16, 2016, respectively, API provided a draft contract of sale and draft lease agreement for BH 329's review and comment.

21. On April 12 & 14, 2016, respectively, BH 329 provided its comments and proposed revisions to the draft contract of sale and draft lease agreement for API's review.

22. Because API was using hazardous substances at the Property to manufacture various products, BH 329 proposed contract provisions necessary to allow API to comply with its obligations under New Jersey's Industrial Site Recovery Act ("ISRA"), which requires the remediation of certain business operations at a location before its sale or transfer.

23. Terms and conditions sufficient to ensure an owner's compliance with ISRA are customarily included in contracts for the sale of similar industrial properties throughout New Jersey, and therefore are in accordance with the terms agreed to by the parties in the LOI.

24. Throughout the negotiating process, API was fully engaged with BH 329 and committed to finalizing the terms and conditions of sale based on the agreed Purchase Price.

25. In reliance on CBRE's continued and repeated representations that it would not continue to market or entertain other offers to purchase the Property, BH 329 entered into an agreement in principle with a third party manufacturing company to lease the Property for at least ten years.

26. Because the commercial real estate market in New Jersey was strong during this period, BH 329 negotiated favorable lease terms anticipated to generate significant profits.

**B.    CBRE Continues to Surreptitiously Market the Property to Interested Buyers and Ultimately Sabotages the Sale of the Property to BH 329.**

27. Upon information and belief, CBRE continued to market the Property to potential buyers while API and BH 329 finalized the terms and conditions of sale.

28. Upon information and belief, because of CBRE's continued marketing efforts, CBRE received a more attractive offer for the Property from another buyer than was offered by BH 329.

29. Upon information and belief, API advised CBRE that it no longer wanted to sell the Property to BH 329 given this new offer.

30. On May 19, 2016, CBRE advised BH 329 that API was rejecting BH 329's proposed revisions to the contract of sale and would no longer engage BH 329 to finalize the terms and conditions contemplated to effectuate a sale of the Property to BH 329.

31. Upon information and belief, API sold the Property to another buyer.

32. BH 329 suffered out of pocket expenses, lost rental income streams, and other potential business opportunities, among other damages, as a result of its reliance upon CBRE's repeated false promises.

## FIRST COUNT

### (Breach of Contract)

33. BH 329 incorporates by reference the allegations set forth in the foregoing paragraphs of the First Amended Complaint as if more fully set forth at length herein.

34. After BH 329 executed the LOI, CBRE, as API's agent, agreed not to market or otherwise entertain other offers to purchase the Property if BH 329 agreed to buy the Property at the Purchase Price.

35. API did not authorize CBRE to stop marketing the Property or to stop entertaining other offers to purchase the Property.

36. CBRE admits it had no authority from API to stop marketing the Property or to stop entertaining other offers to purchase the Property, regardless of BH 329's agreement to buy the Property at the Purchase Price.

37. CBRE acted outside the scope of its authority from API by making these promises to BH 329.

38. BH 329 believed in good faith that CBRE's promises accurately reflected API's negotiating position and intentions.

39. CBRE breached its agreement with BH 329 by continuing to market the Property to potential buyers and entertaining additional offers to purchase the Property despite BH 329's continued agreement to buy the Property at the Purchase Price.

40. BH 329 satisfied all its obligations necessary to effectuate the sale of the Property.

41. As a result of CBRE's conduct, BH 329 has suffered, and continues to suffer, damages.

## SECOND COUNT

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

42. BH 329 incorporates by reference the allegations set forth in the foregoing paragraphs of the First Amended Complaint as if more fully set forth at length herein.

43. The agreement between CBRE and BH 329 contained an implied covenant of good faith and fair dealing.

44. CBRE breached the covenant of good faith and fair dealing by continuing to surreptitiously market the Property to potential buyers despite BH 329's continued agreement to buy the Property at the Purchase Price.

45. As a result of CBRE's breach of the covenant of good faith and fair dealing, BH 329 has suffered, and continues to suffer, damages.

### THIRD COUNT

### (Promissory Estoppel)

46. BH 329 incorporates by reference the allegations set forth in the foregoing paragraphs of the First Amended Complaint as if more fully set forth at length herein.

47. CBRE clearly and definitely promised BH 329 that, in exchange for BH 329's agreement to buy the Property at the Purchase Price, CBRE would not market or otherwise entertain other offers to purchase the Property.

48. CBRE's promises were such that it should reasonably have expected to induce reliance thereon by BH 329.

49. BH 329 detrimentally relied upon CBRE's promises by continuing to pursue the transaction with API under false pretenses, forcing BH 329 to incur costs and forego other business opportunities.

50. Despite CBRE's promises and BH 329's efforts to finalize the contract of sale with API at the Purchase Price, CBRE continued to market the Property to interested buyers, attracting another offer that API ultimately accepted to BH 329's detriment.

51. As a result of the foregoing, CBRE breached its promises to BH 329 and caused, and continues to cause, BH 329 to suffer harm.

### FOURTH COUNT

### (Tortious Interference with a Prospective Business Relation)

52. BH 329 incorporates by reference the allegations set forth in the foregoing paragraphs of the First Amended Complaint as if more fully set forth at length herein.

53. BH 329 had a reasonable expectation of economic gain in connection with its anticipated purchase of the Property from API.

54. CBRE promised BH 329 that it would not continue to market the Property or to entertain any other offers to purchase the Property if BH 329 continued to agree to the Purchase Price.

55. Unbeknownst to BH 329, CBRE made these promises without API's authority and therefore acted beyond the scope of its agency authority.

56. CBRE admits it had no authority from API to stop marketing, or entertaining other offers to purchase, the Property.

57. Upon information and belief, CBRE made these false promises to BH 329 to ensure that BH 329 remained committed to buying the Property, while at the same time CBRE could continue to solicit more attractive offers for API.

58. Despite CBRE's promises not to market the Property and unbeknownst to BH 329, CBRE intentionally and surreptitiously marketed the Property and solicited a more attractive offer from another buyer that API ultimately accepted to BH 329's detriment.

59. Upon information and belief, CBRE realized a significant commission because of API's sale of the Property to another buyer.

60. As a result of CBRE's intentional and malicious interference, BH 329 not only lost the Property, but was forced to abandon at least one profitable leasehold agreement that would have generated significant income streams for at least ten years.

61. But for CBRE's interference, there was a reasonable probability that BH 329 and API would have completed the sale of the Property, and CBRE would have received the anticipated economic benefits associated with the sale.

62. As a result of the foregoing, CBRE breached its promises to BH 329 and caused, and continues to cause, BH 329 to suffer harm.

## FIFTH COUNT

### (Equitable Estoppel)

63. BH 329 incorporates by reference the allegations set forth in the foregoing paragraphs of the First Amended Complaint as if more fully set forth at length herein.

64. CBRE made knowing and intentional misrepresentations to BH 329 that, in exchange for BH 329's agreement to buy the Property at the Purchase Price, CBRE would not market or otherwise entertain other offers to purchase the Property.

65. CBRE's misrepresentations were made under such circumstances that were likely to induce reliance by BH 329.

66. BH 329 detrimentally relied upon CBRE's promises by continuing to pursue the transaction with API under false pretenses, forcing BH 329 to incur costs and forego other business opportunities.

67. As a result of the foregoing, CBRE breached its promises to BH 329 and caused, and continues to cause, BH 329 to suffer harm.

9

**WHEREFORE**, Plaintiff, BH 329 NB, LLC, respectfully requests this Court enter judgment in its favor and against Defendant, CBRE, Inc., for compensatory, incidental, and consequential damages, together with pre-judgment and post-judgment interest, costs, reasonable attorneys' fees, and any such other and further relief as the Court deems equitable and just.

        **FOX ROTHSCHILD, LLP**
        Attorneys for Plaintiff,
        **BH 329 NB LLC**

BY: /s/ Steven J. Link
      BRETT A. BERMAN
      STEVEN J. LINK

Dated:  September 22, 2017

## DEMAND FOR TRIAL BY JURY

BH 329 NB LLC hereby demands a trial by jury of all issues so triable in the within matter.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

BH 329 NB LLC certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

        **FOX ROTHSCHILD, LLP**
        Attorneys for Plaintiff,
        **BH 329 NB LLC**

BY: /s/ Steven J. Link
      BRETT A. BERMAN
      STEVEN J. LINK

Dated:  September 22, 2017